## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JASON W. TRUMBLE,

CASE NO. 2:22-cv-11917

*Plaintiff*,

DISTRICT GERSHWIN A. DRAIN

*v.*

MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

*Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 15)

## I.     RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Jason Trumble, is not disabled.  Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 11), **GRANT** the Commissioner's motion, (ECF No. 15), and affirm the decision.

## II.    REPORT

### A.     Introduction and Procedural History

Plaintiff protectively applied for disability insurance benefits ("DIB") on January 15, 2020, alleging that he became disabled on August 2, 2019.  (ECF No. 9-2, PageID.40; ECF No. 9-5, PageID.250).  The Social Security Administration

1

denied his claims on March 18, 2020.  (ECF No. 9-4, PageID.136).  Plaintiff requested a hearing before an ALJ which was held on June 10, 2021.  (ECF No. 9-2, PageID.72; ECF No. 9-4, PageID.161).   The ALJ issued a decision on June 30, 2021, finding that Plaintiff was disabled within the meaning of the Social Security Act from August 2, 2019 to December 21, 2020, but that he was no longer disabled as of December 22, 2020.  (ECF No. 9-2, PageID.54).  The Appeals Council denied review on June 30, 2022.  (*Id.* at PageID.29).

On August 16, 2022, Plaintiff filed a complaint seeking judicial review of the ALJ's final decision.  (ECF No. 1).  This case was referred to the undersigned, and both parties later filed cross-motions for summary judgment.  (ECF Nos. 3, 11, 15).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation

marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find

that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2022); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most

[the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2022).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was disabled from August 2, 2019 through December 21, 2020. (ECF No. 9-2, PageID.54). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 2, 2019. (*Id.* at PageID.43). At step two, the ALJ concluded that Plaintiff had the following severe impairments: spine disorder with vertebral column fracture and upper extremity fracture. (*Id.* at PageID.44). The ALJ found that Plaintiff's neuropathy was not a medically determinable impairment and that his depression was a nonsevere impairment. (*Id.*) At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically equaled a listed impairment. (*Id.* at PageIID.45). Next, the ALJ determined that from August 2,

5

2019 through December 21, 2020, Plaintiff had a residual functioning capacity to

perform sedentary work with the following limitations:

> no climbing of ladders, ropes, or scaffolds; occasional climbing of stairs and ramps, stooping, kneeling, crouching, crawling, and balancing (as defined in the DOT/SCO); frequent handling bilaterally; no overhead reaching, and no more than frequent reaching in other directions; no foot controls; no exposure to hazards such as unprotected elevations or dangerous moving machinery; no concentrated exposure to vibration; and no exposure to extremes of temperature. From August 2, 2019 through December 21, 2020, the claimant would have been expected to miss more than one workday per month, on an unpredictable basis.

(*Id.*)  At step four, the ALJ found that Plaintiff could not perform his past relevant

work, and at step five, the ALJ found that there were no jobs in the national economy,

existing in significant numbers, that Plaintiff could perform.  (*Id.* at PageID.48).

The ALJ then found that Plaintiff's medical conditions had improved as of

December 22, 2020.  (*Id.* at PageID.50).  The ALJ further found that Plaintiff's

severe impairments as of December 22, 2020 were "the same as that present from

August 2, 2019 through December 21, 2020, and that as of December 22, 2020,

Plaintiff still did not have a "combination of impairments that met or" medically

equaled a listed impairment.  (*Id.* at PageID.49).  At step four, the ALJ determined

that after Plaintiff's medical improvement, he retained the same RFC that he

displayed before December 22, 2020, except that he no longer "would have been

expected to miss more than one workday per month, on an unpredictable basis.  (*Id.*

at PageID.45, 50).  At step four, the ALJ found that Plaintiff could not perform his

past relevant work, but at step five found that Plaintiff could perform jobs that

existed in significant numbers in the national economy. (*Id.* at PageID.53). Accordingly, the ALJ concluded that Plaintiff was no longer disabled as of December 22, 2020. (*Id.* at PageID.54).

### E. Background

#### 1. Medical Evidence

Plaintiff fractured his spine during a motorcycle accident in August 2019. (ECF No. 9-2, PageID.78). Plaintiff was hospitalized, and the following day, he underwent two surgeries to repair his spine. (*Id.* at PageID.46). Two days after his last surgery, Plaintiff "had significant deficits and edema in his upper extremities," but by August 8, he began to show "improvement" in arm mobility and strength. (ECF No. 9-7, PageID.434, 453–54, 460, 467, 474). Physicians discharged Plaintiff from the hospital on August 28. (*Id.* at PageID.515). Plaintiff showed continued signs of improvement on September 18, but on September 25, Plaintiff presented at an emergency room with meningitis. (*Id.* at PageID.517, 580, 754, 762). Plaintiff recovered after three weeks of antibiotics and "home nursing care." (ECF No. 9-8, PageID.1254).

The following month, Plaintiff's neurosurgeon remarked that Plaintiff displayed almost normal strength in both arms. (ECF No. 9-7, PageID.111). At a later appointment, Plaintiff "reported improved range of motion and better function in his upper extremities." (*Id.* at PageID.520–21, 523). And days after that

7

appointment, Plaintiff "had full strength in all four extremities except" that his "left hand grip strength" was rated at a "4+/5." (ECF No. 9-8, PageID.1195).

Throughout 2020, physicians continued to note improvement in Plaintiff's strength and mobility, and by December, a physician opined that Plaintiff would no longer need to follow up with the neurosurgery clinic if an upcoming MRI "look[ed] good," noting that Plaintiff displayed "no overt cranial nerve deficits" and generally normal strength in all extremities. (*Id.* at PageID.1565, 1756). In early 2021, Plaintiff consistently reported having no pain. (*Id.* at PageID.1584–1738).

On January 25, 2021, Plaintiff's primary care physician, Dr. Gonzales, wrote a medical source statement regarding Plaintiff's functional abilities:

> Restrict against repetitive use of the upper extremities and limit reaching, gripping and grasping, fine manipulation and handling objects with bilateral upper extremities to occasional or less over and 8 hour day. Occasional is defined as performing activity up to 1/3rd of the workday or a little over 2.5 hours out of the day, restrict against repetitive neck motions, with no repetitive pushing or pulling with the bilateral upper extremities. Furthermore, to help alleviate Mr. Trumble's severe chronic neck pain, I believe he requires a sit/stand/lie down option that would allow him to lie down at least 2 hours out of an 8 hour day. I would also recommend a weight restriction of lifting no more than 10 pounds as to not cause further injury.

(*Id.* at PageID.1740). Plaintiff's neurosurgeon, Dr Kashlan, wrote another statement the following month containing essentially the same recommendations as Dr. Gonzales. (*Id.* at PageID.1740).

## 2. The Administrative Hearing

8

The ALJ began the hearing by examining Plaintiff.   (ECF No. 9-2, PageID.81).   Plaintiff testified that he could not work because he experienced "neuropathy" which caused pain "in his arms." (*Id.* at PageID.83).   He explained that he could no longer carve wood and that he had difficulty handling a screwdriver, pulling weeds, and holding a wand at a carwash. (*Id.*)   Plaintiff also could bathe and dress himself, but he felt pain when "buttoning" his shirts. (*Id.* at PageID.86). Lifting more than ten pounds "repeatedly" would trigger his neuropathy. (*Id.* at PageID.84).

Plaintiff testified that he performed household chores such as cooking, cleaning, and laundry. (*Id.* at PageID.84–85).   While Plaintiff did not have any "hobbies" following the accident, he would dribble a basketball and rebound for his daughter in their driveway. (*Id.* at PageID.85).   Although Plaintiff could drive, he avoided freeways and limited his driving to short trips. (*Id.* at PageID.86–87). Plaintiff did not take any medication except for "Gabapentin, Amitriptyline, and Extra Strength Excedrin . . . ." (*Id.* at PageID.87–88).   None of these medications caused side effects. (*Id.* at PageID.88).

### 3.      The Vocational Expert's Testimony

The ALJ then questioned the Vocational Expert ("VE"). (*Id.* at PageID.94). The ALJ asked the VE to assume a hypothetical person who could not "perform more than light work" and to further assume:

> That the person should not need to climb ladders, ropes, or scaffolds.
> There can be only occasional climbing of stairs and ramps, stooping,
> kneeling, crouching, crawling, and balancing . . . . Assume limitations
> to frequent overhead reaching or more than frequent reaching in other
> directions. The work should not require foot controls. There should be
> no exposure to hazards, such as unprotected elevations or dangerous
> moving machinery. There should be no concentrated exposure to
> vibration. There should be no exposure to extremes of temperature.

(*Id.* at PageID.95–96). The ALJ testified that an individual with these limitations could not perform Plaintiff's past relevant work as an auto assembler. (*Id.*) However, that individual could work as a hand packer, light work, approximately 62,000 jobs, Dictionary of Occupational Titles ("DOT") code 525.687-118; an inspector, 48,000 jobs, DOT code 559.687-074; and a mail clerk, 48,000 jobs, DOT code 209.687-026. (*Id.* at PageID.96).

The VE then testified that if the same hypothetical person were further limited to sedentary work, then that individual could work as an information clerk, approximately 22, 000 jobs, DOT code 237.367-046; an office helper, 30,000 jobs, DOT code 249.587-018; and a hand packer, 12,000 jobs, DOT code 529.687-138. (*Id.*)

The ALJ then asked the VE to "assume in addition to the other limitations that" the hypothetical individual could not stand or walk for more than two hours out of an eight hour workday. (*Id.* at PageID.97). The VE responded that the same jobs would be available at the sedentary level. (*Id.*) At "the light level," the

10

individual could not work as a mail clerk, and that the hand packer and inspector jobs would each only have 30,000 available jobs. (*Id.*)

Next, the ALJ asked the VE whether an additional limitation restricting the hypothetical individual to "occasional" use of his or her "left, nondominant hand" would affect the individual's ability to "do any of the jobs" the VE previously "listed." (*Id.*) The VE responded that this restriction would preclude the hand packer, office helper, mail clerk, and inspector jobs. (*Id.*) But it would not impact the information clerk position at either the light or sedentary level, and such an individual could work as a "counter attendant," 22,000 jobs, DOT code 249.366-010, if the individual could perform light work. (*Id.* at PageID.97–98).

The VE then testified that an individual could not be absent more than one day per month on average and maintain employment. (*Id.* at PageID.98). Further, an individual could not be off task for more than 10% of the workday and maintain employment. (*Id.*) The VE stated that her testimony was consistent with the DOT, but that she relied on her professional experience when addressing "absenteeism, off task behavior, differentiation between use of left or right extremity, direction of reaching, [and] reduced standing and walking at the light level." (*Id.* at PageID.98–99).

**F. Governing Law**

11

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or

> hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;
>
> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

13

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

14

In addition, the SSA will consider the "[r]elationship with claimant[.]"  *Id.*

§ 404.1520c(c)(3).  This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*  The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."  *Id.* § 404.1520c(c)(4).

15

Finally, the SSA will consider "other factors."  These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."  *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."  *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the

medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior

17

administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii)   Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];
>
> (iii)  Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

18

 (iv) Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

 (v) Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

 (vi) Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

 The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

 The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically

demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g).  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical

20

impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms,

21

what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

## G. Arguments and Analysis

Plaintiff argues that the ALJ erred at step five because she did not present the vocational expert with an RFC that accurately reflected his functional abilities. *See*

*Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). He explains that the ALJ found an under-restrictive RFC by erroneously discounting medical opinions from two of his physicians.

Both physicians provided the ALJ with substantively identical medical source statements in which they opined that Plaintiff should avoid "repetitive use of the upper extremities" and that he should "limit reaching, gripping and grasping, fine manipulation, and handling objects with bilateral upper extremities to" a maximum of one-third of the workday. (ECF No. 9-8, PageID.1583, 1740). They further opined that Plaintiff should avoid "repetitive neck motions," lifting more than ten pounds, and "repetitive pushing or pulling with the bilateral upper extremities." (*Id.*) Last, both physicians suggested that Plaintiff "require[d] a sit/stand/lie down option that would allow him to lie down at least" two hours per workday. (*Id.*)

The ALJ adopted some of these limitations but rejected others. For example, the ALJ agreed that Plaintiff could lift no more than ten pounds at once, but she did not limit Plaintiff's "neck motions." (ECF No. 9-2, PageID.50; *see also id.* at PageID.45). While the physicians believed that Plaintiff could not "repetitive[ly]" push or pull objects and that he only occasionally "handle" objects with his "upper extremities," the ALJ limited Plaintiff to "frequent" handling and reaching, and she found that Plaintiff could neither reach overhead nor climb "ladders, ropes, or scaffolds . . . ." (*Compare* ECF No. 9-8, PageID.1583, 1740, *with* ECF No. 9-2,

24

PageID.50).  And while the ALJ did not agree that Plaintiff's neck pain would require him to sit or lie down at will throughout the workday, she did agree that Plaintiff could not stand for more than two hours per day, and she found that until December 22, 2020, Plaintiff's symptoms would cause him "to miss more than one workday per month, on an unpredictable basis."  (ECF No. 9-2, PageID.45, 50).  *See generally* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983) (defining sedentary work).  Apart from finding that Plaintiff would have been unpredictably absent from work before December 22, 2020, the ALJ found that Plaintiff had the same functional limitations both before and after December 22.  (ECF No. 9-2, PageID.45, 50).

Plaintiff argues that the ALJ erred "as a matter of law" because she did not "properly discuss the consistency and supportability factors in § 404.1520(c) [sic]." (ECF No. 11, PageID.1804–05, 1809).  But despite characterizing the ALJ's treatment of these opinions as a legal error, Plaintiff's principal brief exclusively criticizes the ALJ's factfinding, not her compliance with the regulations.  (*See id.* at PageID.1806–09).  In other words, Plaintiff's initial brief simply argues that the ALJ did not rely on substantial evidence when she discounted the opinions.  Only in Plaintiff's reply brief does he raise any legal issues regarding the ALJ's evaluation of the medical source statements.  (*See* ECF No. 16, PageID.1841–42).  But regardless of how Plaintiff's arguments are characterized, I suggest that the ALJ's findings are procedurally sound and supported by substantial evidence.

25

### 1.      Whether the ALJ Properly Weighed the Medical Source Statements.

To start, the ALJ adequately articulated the basis for her finding and complied with the procedural requirements outlined in § 404.1520c.  As discussed above, an ALJ must consider all medical opinions and explain how persuasive he or she found the opinions of each medical source.  20 C.F.R. § 404.1520c(a)–(b)(1) (2021).  An ALJ may not "defer or give any specific evidentiary weight, including controlling weight" to any medical source—it is the ALJ's responsibility to freely weigh each medical opinion.  20 C.F.R. § 404.1520c(a)–(b)(1).  When considering the persuasiveness of a medical opinion, an ALJ must consider (1) how well the opinion is supported by objective evidence and the medical source's explanations, (2) the opinion's consistency with the entire record, (3) the source's "[r]elationship with the claimant," (4) the specialization of the medical source, and (5) any other factor that may "support or contradict" the medical opinion.  *Id.* § 404.1520c(c).

The regulations explain that "supportability" and "consistency" are the most important of these factors.  *Id.* § 404.1520c(b)(2).  Accordingly, an ALJ need only discuss these two factors in his or her decision.  *Id.*  The ALJ's discussion must be detailed enough to allow a reviewing court "to determine whether" the ALJ's decision "was supported by substantial evidence."  *Hardy v. Comm'r of Soc. Sec.*, 20-10918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021) (quotation marks

26

omitted) (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

As required by § 404.1520c, the ALJ discussed both the supportability and consistency factors in enough detail to allow meaningful, judicial review. The "supportability" factor considers the degree to which a medical source provided "objective medical evidence and supporting explanations . . . to support his or her medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(1); *see also Barber v. Comm'r of Soc. Sec. Admin.*, No. 1:20-cv-00064, 2022 WL 853208, at *2 (M.D. Tenn. Mar. 22, 2022). And here, the ALJ explained that neither physician provided any medical evidence in support of their opinions, and apart from a brief overview of Plaintiff's "medical history," both medical source statements were entirely conclusory. (ECF No. 9-2, PageID.52) (citing ECF No. 9-8, PageID.1583, 1740). Although Plaintiff argues that the ALJ's discussion of this factor is underdeveloped (ECF No. 16, PageID.1841), the ALJ's finding that the physicians failed to explain how the objective medical evidence in Plaintiff's record supported their conclusions is concise and clear enough to allow the Court to understand her evaluation of this factor. *See Hardy v. Comm'r of Soc. Sec.*, 2021 WL 3702170, at *4. Brevity alone does not warrant remand.

The ALJ also considered the opinions' consistency with the record. Detailing Plaintiff's recovery from his accident, the ALJ reasoned that the record did not fully

reflect the significant limitations recommended by Plaintiff's physicians. Indeed, the ALJ noted that less than three months after his injury, Plaintiff's neurosurgeon, Dr. Kashlan, noted that Plaintiff displayed almost normal strength in both arms, grading Plaintiff's left arm sat a "4/5" and his right arm at a "4+/5."   (ECF No. 9-7, PageID.111).[1]  By November 5, 2019, Plaintiff "reported improved range of motion and better function in his upper extremities," and less than a week later, he "had full strength in all four extremities except" that his "left hand grip strength" was rated at a "4+/5."  (*Id.* at PageID.520–21, 523; ECF No. 9-8, PageID.1195).   Around this time, Plaintiff had begun household chores such as "dishwashing, cooking, and taking out trash," and on December 3, he reported that his range of motion in his arms had improved.  (ECF No. 9-2, PageID.47) (citing ECF No. 9-8, PageID.1170, 1197).  By January 13, Plaintiff finished "slowly weaning" from his "cervical collar" and he had begun to drive.  (*Id.*) (citing ECF No. 9-7, PageID.524).

Between January and April 2020 both Dr. Kashlan and Dr. Gonzales, Plaintiff's primary care provider, noted continued improvement in Plaintiff's strength and arm mobility.  (*Id.* at PageID.52–53).  Dr. Kashlan, for example, wrote on January 6 that Plaintiff was "doing well" and that he had no "activity restrictions." (ECF No. 9-7, PageID.582, 1034).  By April 30, "the only active problem listed was

---

[1] *See generally* Soren O'Neil, et al., *Using 4+ to Grade Near-Normal Muscle Strength Does Not Improve Agreement*, Chiropractic and Manual Therapies, Oct. 10, 2017, at 1–4, https://chiromt.biomedcentral.com/articles/10.1186/s12998-017-0159-6.

28

depression," and by December 22, 2020, a nurse practitioner at the University of Michigan Neurosurgery clinic remarked that Plaintiff had "no overt cranial nerve deficits," that Plaintiff displayed generally normal strength in all of his extremities, and that Plaintiff would no longer need to "follow up in the Outpatient Neurosurgery Clinic." (ECF No. 9-8, PageID.1565, 1756).

Following that December 22 appointment, Plaintiff's pain began to improve. From January through February 2021, Plaintiff repeatedly reported having "no pain." (ECF No. 9-2, PageID.53) (citing ECF No. 9-8, PageID.1584–1738). He also did not seek out treatment from "a pain management specialist" and he testified to only taking "Gabapentin" and "Extra Strength [Excedrin]" for pain management. (*Id.* at PageID.87–88) (citing ECF No. 9-8, PageID.1696). Accordingly, the ALJ discussed, at length, the consistency of the opinions with the record.

But notwithstanding the ALJ's discussion of the supportability and consistency factors, Plaintiff argues that the ALJ erred by not specifically discussing the physicians' opinion that he should avoid repetitive neck movements. (ECF No. 16, PageID.1841–42). However, the regulations explain that where a medical source opines on multiple functional abilities, the ALJ need not discuss each opinion individually; rather, the ALJ need only discuss the medical source's opinions as a whole, "using the [applicable] factors . . . as appropriate." *Id.* § 404.1520c(a). Thus the ALJ did not err by declining to explicitly discuss each discrete opinion contained

29

in the medical source statements.

Accordingly, I suggest that the ALJ complied with § 404.1520c and articulated her rationale in enough detail to allow the Court to understand the basis for her finding.

## 2.    Whether the ALJ Relied on Substantial Evidence.

Not only did the ALJ comply with the regulations when assessing the medical source statements, but she supported her finding with substantial evidence.  Again, the ALJ's RFC findings were only moderately less restrictive than the medical source statements.  And the ALJ thoroughly explained that she found the statements to be only partially persuasive because they were unsupported and inconsistent with much of the record.

Even so, Plaintiff argues that the ALJ did not support her consistency finding with substantial evidence because she "cherry picked" corroborating evidence. (ECF No. 11, PageID.1806–08).  Arguments that an ALJ "cherry picked" evidence are seldom successful because in most circumstances, "the same process can be described more neutrally as weighing the evidence."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).  Unless an ALJ truly ignored the overwhelming weight of authority, crediting an argument that the ALJ "cherry picked" evidence typically requires the District Court to reweigh the evidence.  *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014).  But the Court cannot reverse an ALJ's

decision just because substantial evidence may have supported another finding—this Court's review is limited to whether the ALJ's decision was supported by substantial evidence. *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017).

Here, Plaintiff's argument that the ALJ cherry picked the record amounts to a request for the court to reweigh the evidence. Plaintiff first criticizes the ALJ for mentioning that occupational therapy notes from January and February 2021 reported that Plaintiff experienced "no pain," but failing to mention that the same notes also reported that Plaintiff "quickly" fatigued when bicep curling a twelve pound dumbbell for ten repetitions. (ECF No. 9-8, PageID.1700, 17111 1715). But while the ALJ did not explicitly reference this statement, she nonetheless restricted Plaintiff to sedentary work, meaning that she believed that Plaintiff could lift no more than ten pounds at once and that he could only "occasionally" lift or carry "articles like docket files, ledgers, and small tools." SSR 83-10, 1983 WL 31251, at *5. Moreover, the ALJ found that Plaintiff could not perform a full range of reaching and handling objects, and she cited several reports of Plaintiff's strength throughout her decision. (ECF No. 9-2, PageID.45–53). At bottom, the ALJ did not "ignore" evidence of Plaintiff's "fatigue and weakness"—she imposed a highly restrictive RFC that reasonably reflected the evidence available in the record.

Plaintiff also argues that the ALJ "cherry picked" evidence by citing treatment notes from December 22, 2020 without explicitly mentioning that in the same report,

31

the nurse practitioner wrote that Plaintiff was "in almost constant pain in his arms" and that "he had one day" in the "last week" where "he was pain free . . . ." (ECF No. 9-8, PageID.1562–63). But nowhere in the decision does the ALJ appear to dispute that Plaintiff experienced significant pain before December 22. She does, however, note that after December 22, Plaintiff consistently reported having "no pain," and the ALJ adjusted her RFC finding accordingly to note that after December 22, Plaintiff would not be "expected to miss more than one workday per month." (ECF No. 9-2, PageID.45, 50, 53). Neither Dr. Kashlan nor Dr. Gonzales opined on Plaintiff's absenteeism, and even if they had, the Court cannot reverse simply because substantial evidence might also support a different conclusion. *Shepard*, 705 F. App'x at 440.

Apart from his arguments that the ALJ "cherry picked" evidence, Plaintiff also takes issue with the ALJ's reliance on evidence from the period during which Plaintiff was disabled. (ECF No. 11, PageID.1807–08). He reasons that evidence from "a time period when [he] was found to be disabled" cannot "provide support for a finding that Plaintiff has made medical improvement" and therefore cannot be used to evaluate either medical opinion. (*Id.*) But while it is true that an ALJ cannot rely exclusively on evidence from a period that a claimant was disabled to establish that the claimant's conditions improved, the ALJ here did not discount the opinions because she found a medical improvement. *See David G. v. Comm'r of Soc. Sec.*,

No. 19-CV-1490, 2021 WL 164289, at *3 (W.D.N.Y. Jan. 19, 2021). Plaintiff's RFCs before and after December 22, 2020, are nearly identical. (ECF No. 9-2, PageID.45, 50). Both RFCs limit Plaintiff to sedentary work and both place the same restrictions on Plaintiff's use of his arms and hands. (*Id.*) While the ALJ found that Plaintiff's condition had gradually improved, she concluded that these improvements only impacted Plaintiff's RFC insofar as they affected his absenteeism. (*Id.*) But because neither physician addressed this aspect of Plaintiff's functional abilities, the ALJ's evaluation of the opinions applies equally to both periods. In other words, even if the ALJ did not find a medical improvement, she would have reached the same conclusions regarding the persuasiveness of the medical source statements. Accordingly, I suggest that the ALJ relied on substantial evidence in evaluating the persuasiveness of the medical source statements.

## H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 11, **GRANTING** the Commissioner's Motion (ECF No. 115), and affirming the decision.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may

serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date:  March 15, 2023                           S/PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge